**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 01-40366

DIAMOND OFFSHORE COMPANY;
DIAMOND OFFSHORE USA, INC.;
DIAMOND OFFSHORE DRILLING, INC.;
DIAMOND OFFSHORE DRILLING SERVICES INC.,

Plaintiffs-Counter Defendants-
Appellants-Cross-Appellees,

versus

A & B BUILDERS, INC.,

Defendant-Counter Claimant-
Appellee-Cross-Appellant.

Appeals from the United States District Court
for the Southern District of Texas

August 30, 2002

Before EMILIO M. GARZA, BENAVIDES, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Diamond Offshore Company, Diamond Offshore U.S.A. Inc., Diamond Offshore Drilling,

Inc., and Diamond Offshore Drilling Services, Inc. (collectively "Diamond") appeal the district court's

entry of final judgment dismissing Diamond's suit without considering Diamond's breach of contract

claim. A&B Builders, Inc. ("A&B") cross-appeals the district court's order granting partial summary

judgment in favor of Diamond. For the reasons that follow, we affirm the partial summary judgment ruling in part, reverse and remand in part, and vacate the entry of final judgment and remand for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

Diamond is engaged in the exploration and development of offshore oil and gas wells. A&B is a contractor that provides repair and maintenance services for offshore oil platforms and drilling rigs. On April 8, 1997, Diamond and A&B entered into a "Master Service Contract" whereby A&B agreed to provide services to Diamond from time to time. Paragraph 9 of the Master Service Contract contains an indemnity provision that specifically applies to claims for bodily injury brought by employees of either A&B or Diamond, including those that result from the negligence of the indemnitee. Under this provision, if a Diamond employee is injured by the negligence of A&B, Diamond agreed to defend and indemnify A&B against any claims brought by Diamond's employee. Should an A&B employee be injured by the negligence of Diamond, A&B agreed to defend and indemnify Diamond and all of the parties for whom Diamond may be working against any claims brought by A&B's employees. Paragraph 8 of the Master Service Contract obligates A&B to purchase various insurance policies, establishes the minimum coverage limits of these policies, and obligates A&B to waive subrogation against Diamond and name Diamond as an "Additional Named Assured[]."

Pursuant to the Master Service Contract, Diamond engaged A&B to perform repairs to the *Ocean Concorde*, a semi-submersible drilling rig owned and operated by Diamond, that were necessary so that the *Ocean Concorde* "could do its usual work." A semi-submersible drilling rig is a movable rig that is typically towed to a particular location where it is submerged about fifty feet and

2

then anchored in place to complete the mooring of the rig. The rig's platform deck is supported on columns which are attached to large underwater displacement hulls, large vertical caissons, or some combination of both. The columns, displacement hulls, or caissons are flooded on location.[1]

Lee E. McMillon ("McMillon"), an employee of A&B, worked aboard the *Ocean Concorde* pursuant to the Maser Service Contract between Diamond and A&B. On March 7, 1998, McMillon was allegedly injured while performing repair services as a welder on the *Ocean Concorde*. McMillon maintains that, while welding inside a pollution pan, he was injured when he became trapped by drilling mud that was spilled on top of him. The welding being done by McMillon at the time of his alleged injury was necessary to allow the *Ocean Concorde* to perform its drilling function without polluting the waters of the Gulf of Mexico. At the time of McMillon's alleged injury, the *Ocean Concorde* was located in navigable waters more than 100 miles offshore in the Gulf of Mexico.

On March 9, 1999, McMillon and his wife sued Diamond, Shell Oil Company ("Shell"),[2] and various Shell-affiliated companies for his injuries in the 212th Judicial District Court of Galveston, Texas. Diamond made a demand upon A&B for defense and indemnity pursuant to the terms of the Master Service Contract. When A&B did not respond to this demand, Diamond employed counsel to defend Diamond in the McMillon suit.

Diamond then initiated the present action against A&B in federal court seeking declaratory relief and damages for breach of contract. The district court's general admiralty jurisdiction was

---

[1]THOMAS J. SCHOENBAUM, 1 ADMIRALTY AND MARITIME LAW § 3-9, at 108 n.8 (3d ed. 2001) (describing semi-submersible rigs and other rigs); HOWARD R. WILLIAMS & CHARLES J. MEYERS, MANUAL OF OIL AND GAS TERMS 996 (11th ed. 2000) (defining semi-submersible rig).

[2]At the time of McMillon's alleged injury, the *Ocean Concorde* was working under a contract with Shell Oil company.

invoked pursuant to 28 U.S.C. § 1333. Diamond claimed that A&B refused to act in accordance with the indemnity provision and failed to reveal whether it obtained liability insurance coverage naming Diamond as an additional insured. Diamond sought a determination of its rights to indemnification, insurance, and a defense under the terms of the Master Service Contract. Diamond also sought damages for breach of contract; specifically, costs and attorneys' fees incurred in defending the McMillon suit and bringing this action.[3]

Diamond and A&B then filed cross-motions for partial summary judgment. On November 17, 1999, the district court denied A&B's motion. At the same time, the district court granted Diamond's motion, determining that: (1) the indemnity provision was valid and A&B owed defense and indemnity to Diamond in the McMillon suit; (2) the additional-insured provision created an independent obligation, separate from the indemnity provision, and A&B was obligated to procure the requisite insurance and name Diamond as an additional insured; and (3) Diamond would be entitled to recover damages for breach of contract if A&B has failed to procure the requisite insurance and name Diamond under the contract. The court then entered a final judgment dismissing the entire case.

On November 19, 1999, Diamond filed a motion to reconsider the district court's entry of final judgment, urging the court to retain jurisdiction over Diamond's claim for damages sustained as a result of A&B's breach of contract. The court denied this motion on November 23, 1999.

Diamond appealed and A&B cross-appealed. On August 3, 2000, a panel of this Court remanded the case to establish "whether McMillon directly qualified for coverage under Section

---

[3]Paragraph 23 of the Master Service Contract provides for recovery of attorneys' fees and costs incurred in enforcing the rights delineated in the Master Service Contract.

4

905(b) of the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 905(b)." On November 3, 2000, the district court entered an order, based upon the joint stipulation of the parties, finding that McMillon directly qualified for workers' compensation benefits under the LHWCA. The district court entered another final judgment on March 9, 2001. Again, Diamond appealed and A&B cross-appealed.

In this appeal, Diamond challenges the district court's decision to not consider awarding damages to Diamond. A&B cross-appeals the partial summary judgment rulings on the indemnity and insurance provisions.

DISCUSSION

I.

"We review a district court's decision not to exercise its jurisdiction for an abuse of discretion; its underlying legal conclusions, *de novo*." Bank One, N.A. v. Boyd, 288 F.3d 181, 183-84 (5th Cir. 2002).

Diamond argues that the district court erred in not exercising jurisdiction over its breach of contract claim. We agree.

The federal courts have a "virtually unflagging obligation" to exercise the jurisdiction conferred upon them. Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976); see also Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716 (1996) ("[F]ederal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress."). Abdication of the obligation to decide cases under the doctrine of abstention can be justified in "exceptional circumstances, where denying a federal forum would clearly serve an important countervailing interest," such as considerations of "proper constitutional adjudication, regard for federal-state

5

relations, or wise judicial administration." Quackenbush, 517 U.S. at 716 (citations and internal quotations omitted). "Unless there is a legitimate reason to abstain, federal courts 'cannot abdicate their authority or duty in any case in favor of another jurisdiction.' " Vulcan Materials Co. v. City of Tehuacana, 238 F.3d 382, 390 (5th Cir. 2001) (quoting New Orleans Pub. Serv., Inc. v. Council of New Orleans, 491 U.S. 350, 358 (1989)). There are four general categories of abstention:

> "(1) Pullman-type abstention, to avoid decision of a federal constitutional question where the case may be disposed of on questions of state law; (2) Burford-type abstention, to avoid needless conflict with the administration by a state of its own affairs; (3) abstention to leave to the states the resolution of unsettled questions of state law; and (4) abstention to avoid duplicative litigation, now frequently referred to as Colorado River-type abstention."

Id. (quoting 17A CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 4241 (2d ed. 1988)).

The district court dismissed Diamond's breach of contract claim without assigning reasons. In the district court's order denying Diamond's motion to reconsider, however, the court gave the following explanation for declining to "retain jurisdiction and issue a judgment for damages upon the conclusion of the state court action":

> The Court has gone to considerable trouble to analyze the underlying contract and applicable law. Diamond has prevailed on the issue of liability, and has received a judgment entitled to full res judicata effect. In light of its enormous docket obligations, and faced with an increase in civil filing this year, the Court sees little point in keeping this case open to await the eventual disposition of McMillon's state court action. While it may be more convenient for Diamond to get a judgment for damages in this Court, there is no reason why a state court could not enter an equally valid and effective judgment.

We have considered the grounds asserted in support of the dismissal of Diamond's breach of contract claim and find none of them, alone or together, sufficient. The heavy trial docket, the preclusive effect of the district court's judgment, the potential for Diamond to incur further damages in the

McMillon suit, and the fact that the state court would provide an adequate alternative forum, are not exceptional circumstances warranting abstention.

A&B maintains, however, that the district court did not abuse its discretion in deciding to abstain because the court properly characterized this case as a pure declaratory judgment action and concluded that abstention was warranted because it would be more appropriate for a state court to render a judgment for damages after liability and any damages were ascertained in the McMillon suit. A district court does have broader discretion to decline to hear a claim for declaratory judgment than a breach of contract claim. See Vulcan Materials, 238 F.3d at 390. Although the district court repeatedly characterized this case as a "declaratory judgment action," the court acknowledged that Diamond requested "a judgment for damages" in its order denying Diamond's motion to reconsider and recognized that "Diamond brought this action . . . seeking declaratory relief and damages for breach of contract" in its request for clarification of this Court's remand mandate of August 3, 2000. To the extent that the district court classified Diamond's suit as a "declaratory judgment action," the court erred as a matter of law. Although some of the relief sought by Diamond is declaratory in nature, Diamond also requested damages for breach of contract–i.e., defense costs in the McMillon suit–as well as damages arising from enforcing that contract–i.e., attorneys' fees and costs incurred in this federal action.[4] Inclusion of this request for monetary relief removes this suit from the realm of a declaratory judgment action.[5] See Southwind Aviation, Inc. v. Bergen Aviation, Inc., 23 F.3d

---

[4]Diamond's First Amended Original Complaint sought "a declaration of their rights under the Master Services Contract . . . *as well as the damages set out below.*" Diamond's prayer for relief requested a judgment for defense costs, attorneys' fees, any judgment that may result from the McMillon suit, any damages that may result from A&B's breach of contract, and court costs.

[5]A&B attempts to avoid this conclusion by arguing that Diamond's claim for monetary relief is premature, frivolous, and merely an attempt to avoid application of the district court's broad

7

948, 950 (5th Cir. 1994) (holding that the district court erred as a matter of law in characterizing a suit as a declaratory judgment action where the plaintiff sought declaratory relief and "coercive remedies for breach of contract in the form of damages, attorney's fees, and injunctive relief"). Thus, contrary to A&B's assertion, because Diamond sought both declaratory and monetary relief in this admiralty action, dismissal of Diamond's breach of contract claim after applying the abstention standards for declaratory judgment actions would be inappropriate. See id.; cf. GEICO v. Dizol, 133 F.3d 1220, 1225 n.6 (9th Cir. 1998) (noting that a district court is "without discretion to remand or decline" claims for monetary relief appended to declaratory judgment actions because they are within its federal diversity jurisdiction).

A&B also contends, alternatively, that the district court had discretion to dismiss Diamond's breach of contract claim under the "exceptional circumstances" test of Colorado River abstention doctrine.[6] This doctrine only applies when there are parallel proceedings pending in federal and state

---

discretion in declaratory judgment actions. In support of this contention, A&B cites our decision in PPG Industries, Inc. v. Continental Oil Co.. 478 F.2d 674, 679 (5th Cir. 1973) (stating that when a party seeks both declaratory and injunctive relief, "[i]f the prayer for injunctive relief could be determined to be frivolous or premature or otherwise 'wanting in equity,' then the suit could be considered solely a declaratory judgment action" for abstention purposes). There is no indication that Diamond's request for monetary relief is either frivolous or made in an attempt to avoid abstention standards for declaratory judgment actions. Further, despite the fact that Diamond's total damages may not be fixed until the conclusion of the McMillon suit, Diamond's breach of contract claim is not premature. Thus, we conclude that A&B's argument is without merit.

[6]The Supreme Court has identified six factors to consider in determining whether "exceptional circumstances" exist that permit a court to abstain out of deference to pending state court proceedings: (1) "assumption by either court of jurisdiction over a res," (2) "relative inconvenience of the forums," (3) "avoidance of piecemeal litigation," (4) "the order in which jurisdiction was obtained by the concurrent forums," (5) "to what extent federal law provides the rules of decision on the merits," and (6) the adequacy of the state proceedings in protecting the rights of the party invoking federal jurisdiction." Black Sea Inv. Ltd. v. United Heritage Corp., 204 F.3d 647, 650 (5th Cir. 2000).

8

court.  See RepublicBanc Dallas, Nat'l Assoc. v. McIntosh, 828 F.2d 1120, 1121 (5th Cir. 1987); see also Union Planters Bank, N.A. v. Gaval, No. 02-1224, 2002 WL 975675, at *4 (E.D. La. May 9, 2002).  Suits are "parallel," for the purposes of determining whether Colorado River abstention applies, if they "involv[e] the same parties and the same issues."  McIntosh, 828 F.2d at 1121 (quoting PPG Indus., Inc. v. Continental Oil Co., 478 F.2d 674, 682 (5th Cir. 1973)); see also Mediola v. Hart, 561 F.2d 1207, 1208 (5th Cir. 1977).  As Diamond's federal case against A&B is clearly not parallel with McMillon's state court proceeding against Diamond, Shell, and others, we reject A&B's contention that the district court had discretion to abstain under the Colorodo River doctrine.

We therefore find that the district court abused its discretion in refraining from exercising jurisdiction over Diamond's breach of contract claim.[7]

## II.

We review the grant or denial of summary judgment *de novo*, applying the same standard as the district court.  Mowbray v. Cameron County, Tex., 274 F.3d 269, 278 (5th Cir. 2001).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  If the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the nonmoving party to produce evidence of the existence of a genuine issue for trial.  Celotex Corp. v.

---

[7] A&B argues that this abuse of discretion is harmless because Diamond has sustained no damages. This argument depends entirely upon A&B prevailing on all of the issues raised in its cross-appeal. In light of our rulings on those issues below, this case must be remanded to the district court to address the issue of damages.  Thus, A&B's argument is without merit.

9

Catrett, 477 U.S. 317, 321-22 (1986). We review questions of fact in the light most favorable to the nonmovant, and we review questions of law *de novo*. Mowbray, 274 F.3d at 279.

A.

A&B challenges the district court's ruling that the indemnity agreement is valid. First, A&B argues that the indemnity provision is void because it directly contravenes § 905(b) of the LHWCA. Second, A&B maintains that state law governs the Master Service Contract and invalidates the indemnity provisions at issue.

1.

A&B argues that § 905(b) of the LHWCA rendered the indemnity clause of the Master Service Contract invalid. The district court rejected this argument, determining that the indemnity provision was saved by § 905(c) of the LHWCA. Diamond Offshore Co. v. A&B Builders, Inc., 75 F. Supp. 2d 676, 681-84 (5th Cir. 1999). Section 905(b) prohibits indemnification by the employer of a covered employee for a claim due to bodily injury brought by the employee against the vessel (including its owner).[8] 33 U.S.C. § 905(b). However, if the injured employee is entitled to receive the benefits of the LHWCA "by virtue of" § 1333(b) of the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. § 1331 et seq., then § 905(c) provides an exception, allowing "any reciprocal indemnity provision whereby the employer . . . and the vessel agree to defend and indemnify the other

---

[8]Section 905(b) provides in relevant part that:
In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person . . . may bring an action against such vessel as a third party . . . and the employer shall not be liable to the vessel for such damages directly or indirectly, and any agreements or warranties to the contrary shall be void.
33 U.S.C. § 905(b).

for the cost of defense and loss or liability for damages arising out of or resulting from death or bodily injury to their employees." 33 U.S.C. § 905(c).

A&B puts forth two primary grounds in support of its contention that the district court erred in finding that the § 905(c) exception applied to this case.[9] First, A&B argues that there is no summary judgment evidence that McMillon qualified for LHWCA workers' compensation benefits under § 1333(b) of the OCSLA. Second, A&B contends that the indemnity provision is not "reciprocal." We address both of these grounds in turn.

A&B contends that the district court erred in concluding that McMillon qualified for LHWCA workers' compensation benefits under § 1333(b) because there is no summary judgment evidence that OSCLA's situs and status requirements are met. In order to recover LHWCA benefits by virtue of § 1333(b), notwithstanding any application of the LHWCA of its own force, the injured worker must satisfy "status" requirement of § 1333(b) and the "situs" requirement of § 1333(a)(1). Demette v. Falcon Drilling Co., Inc., 280 F.3d 492, 498 (5th Cir. 2002); see also Mills v. Dep't of Labor, 877 F.2d 356, 361-62 (5th Cir. 1989) (en banc). The following three locations satisfy the "situs" requirement of § 1333(a)(1):

(1) the subsoil and seabed of the OCS;
(2) any artificial island, installation, or other device if
(a) it is permanently or temporarily attached to the seabed of the OCS, and
(b) it has been erected on the seabed of the OCS, and

---

[9]A&B's third argument is without merit. A&B argues that the § 905(c) exception does not override § 905(b) because McMillon is directly covered by the LHWCA and thereby was not entitled to receive LHWCA benefits *exclusively* "by virtue of" the OCSLA. As A&B itself recognizes, this Court previously rejected this precise argument in Demette v. Falcon Drilling Co., Inc., 280 F.3d 492, 502 (5th Cir. 2002). In Demette, we concluded that the plain meaning of "by virtue of" in § 905(c) "does not imply exclusivity." Id. A&B asserts that Demette's interpretation of § 905(c) "does violence" to OCSLA. Because we cannot overrule or ignore an earlier panel's decision, we reject A&B's argument. See United States v. Ruiz, 180 F.3d 675, 676 (5th Cir. 1999).

11

(c) its presence on the OCS is to explore for, develop, or produce resources from the OCS;

(3) any artificial island, installation, or other device if

(a) it is permanently or temporarily attached to the seabed of the OCS, and

(b) it is not a ship or vessel, and

(c) its presence on the OCS is to transport resources from the OCS.

Demette, 280 F.3d at 497.[10] Section 1333(b) creates the following "status" test: The LHWCA applies to injuries "occurring as the result of operations conducted on the [OCS] for the purpose of exploring for, developing, removing, or transporting by pipeline the natural resources, or involving rights to the natural resources, of the subsoil and seabed of the [OCS]." 43 U.S.C. § 1333(b); see also Demette, 280 F.3d at 498.

A&B argues that the district court erred in its situs determination because it applied the wrong situs test and there is no summary judgment evidence that McMillon's alleged injury occurred on one of the three locations that qualify as a § 1333(a)(1) situs under Demette.[11] Demette concerned a

---

[10]Section 1333(a)(1) states, in pertinent part:

The Constitution and laws and civil and political jurisdiction of the United States are hereby extended to the subsoil and seabed of the [OCS] and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources, to the same extent as if the [OCS] were an area of exclusive Federal jurisdiction located within a State.

43 U.S.C. § 1333(a)(1)

[11]Alternatively, A&B avers that the district court's situs determination is erroneous because the undisputed fact that the alleged injury occurred on a LHWCA situs precludes the possibility that it occurred on an OSCLA situs. To qualify under the LHWCA, an employee must meet a two-pronged "situs" and "status" test. Green v. Vermillion Corp., 144 F.3d 332, 334 (5th Cir. 1998). The LHWCA "situs" requirement is met if an employee is injured upon navigable waters. Id. On remand to the district court, the parties stipulated that McMillon qualified for benefits directly under the LHWCA and that McMillon's alleged injury occurred over navigable waters. The district court agreed that McMillon directly qualified for benefits under the LHWCA. A&B argues that since McMillon's alleged injury occurred over navigable waters, this precludes a finding that the alleged injury occurred on an OCSLA situs, which is an "island." Again, Demette forecloses this argument.

worker who sued the owner an offshore jack-up drilling rig under the LHWCA for injuries sustained while performing casing work on the rig. Demette, 280 F.3d at 494. The rig owner, a contractor of the drilling rights owner, sued the injured worker's employer for defense and indemnity pursuant to an indemnity agreement between the employer and the drilling rights owner. Id. at 495. This Court addressed the issue of whether the LHWCA invalidated the indemnity agreement. Id. at 494. In addressing the applicability of the § 905(c) exception, we considered whether the injury occurred on an OCSLA situs. Id. at 498. Relying on the text of § 1333(a)(1), we articulated a precise rule that defines three locations that qualify as an OCSLA situs. Id. at 496-97. Applying this rule to the facts before us, we held that the situs requirement of § 1333(a)(1) was met because, at the time of the worker's injury, the rig was "jacked-up over the OCS" and therefore fell into the second category of OCSLA situses: the rig "was a device temporarily attached to the seabed, which was erected on the OCS for the purpose of drilling for oil." Id. at 498.

Because the district court's partial summary judgment ruling was in November of 1999, the court did not have the benefit of our decision in Demette, which was decided when the parties were briefing this appeal. Instead, the district court relied on our prior decision in Mills. The district court held that in order to qualify under OCSLA, an employee must satisfy the situs test, i.e., suffer injury either on a fixed platform over the OCS or over the waters of the OCS. Diamond Offshore, 75 F. Supp. 2d at 683. Observing that "McMillon was employed as a welder, and was injured in the Gulf of Mexico more than 100 miles off the Louisiana coast," the district court concluded that McMillon

In Demette, the parties agreed that Demmette qualified under the LHWCA itself. 280 F.3d at 502 & n.45. This did not impact the court's conclusion that Demette's injury occurred on an OCSLA situs. Id. at 501.

13

satisfied the situs requirement because "he was injured on the navigable waters overlying the Outer Continental Shelf." Id.

Diamond counters that the district court applied the correct situs test because Demette did not limit the situs test established in Mills. Since Demette addressed an injury occurring on a drilling rig that was attached to the seabed of the OCS, as opposed to floating on the water above the OCS, Diamond would have us read the Demette situs test as dicta. Diamond claims that construing Demette otherwise wo uld run afoul of our well-established rule that a panel of this Court cannot overrule a previous *en banc* decision. This argument is unavailing. Demette clearly articulated the rule regarding what qualifies as an OCSLA situs. We conclude that the Demette situs test is binding and that it does not conflict with our prior decision in Mills. Mills stated that § 1333(b) applies to workers who "suffer injury or death on an OCS platform or the waters above the OCS." 877 F.2d at 362. As we previously explained in Demette, however, Mills does not purport to specify the precise contours of OCSLA's situs requirement. Demette, 280 F.3d at 496 ("Neither the Supreme Court nor this court has parsed the precise language of [OCSLA] to specify the exact contours of the situs test it establishes. We are called upon to do so today."). In Mills, we dealt with whether a land-based welder injured on Louisiana soil qualified for LHWCA benefits under OCSLA. 861 F.2d at 357. We rejected the worker's claim, concluding that § 1333(b) includes a situs requirement that the worker did not satisfy. Id. at 361-62. Thus, Mills held that § 1333(b) does not apply to a land-based injury. Id. at 362; see also Demette, 280 F.3d at 496 n.10 ("Mills interpreted § 1333(b) and held that it could not apply to injuries that do not occur on or over the OCS.").

Our decision in Demette for the first time laid out a precise rule that defines three "locations" to which OCSLA applies. In light of Demette, it is evident that the district court applied the wrong

14

situs test. Contrary to the district court's holding, the OCSLA situs test is not satisfied merely because McMillon's alleged injury occurred on the navigable waters overlying the OCS. Nonetheless, if the evidence in the summary judgment record is sufficient to meet the situs requirement set forth in Demette, we can affirm the district court's situs determination.

Diamond and A&B dispute whether the summary judgment evidence shows that McMillon's alleged injury falls into the second category of OCSLA situses set forth in Demette.[12] The second category is described as follows: "[A]ny artificial island, installation, or other device if (a) it is permanently or temporarily attached to the seabed of the OCS, and (b) it has been erected on the seabed of the OCS, and (c) its presence on the OCS is to explore for, develop, or produce resources from the OCS." Demette, 280 F.3d at 497. Diamond points to the following competent evidence in the summary judgment record to support its contention that the second category is met:[13] (1)

---

[12]The first and third categories of OCSLA situses are not applicable to this case. With respect to the first type of OCSLA situs, there is no evidence that McMillon's alleged injury occurred on the "the subsoil and seabed of the OCS." Demette, 280 F.3d at 497. Because the *Ocean Concorde* is a semi-submersible drilling rig, which is undisputably a vessel, the requirement that the "device . . . is not a . . . vessel" precludes the application of the third category. Id. at 497-98 & n.18.

[13]Diamond put forth two affidavits by Kenneth A. Bradley ("Bradley"), the Director of Claims for Diamond, in support of its motion for partial summary judgment. A&B argues that the affidavits were not competent summary judgment evidence because they were not based on personal knowledge, and the factual statements are inadmissible hearsay. A&B "objected" to Bradley's first affidavit in its motion for partial summary judgment and its response to Diamond's motion for partial summary judgment, and to Bradley's second affidavit in its reply to Diamond's response to A&B's motion for partial summary judgment. Specifically, A&B argued that the affidavits are not competent summary judgment evidence because they were not based on personal knowledge and did not affirmatively show that the affiant was competent as required by Federal Rule of Civil Procedure 56(e), and that the affidavit testimony was inadmissible under Federal Rule of Evidence 602. See FED. R. CIV. P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."); FED. R. EVID. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). Thus, A&B contends that the district court erred in not

15

McMillon allegedly was injured over 100 miles offshore in the Gulf of Mexico, (2) the *Ocean Concorde* is a semi-submersible drilling rig, (3) the *Ocean Concorde* was working under a contract with Shell when McMillon was allegedly injured, (4) Diamond engaged A&B to perform repairs that were necessary in order for the *Ocean Concorde* to "do its usual work," (5) the welding being done by McMillon at the time of his alleged injury was necessary to allow the *Ocean Concorde* to perform its drilling function without polluting the waters of the Gulf of Mexico; and (6) McMillon was allegedly injured when drilling mud was spilled on top of him while he was welding inside a pollution pan. While this evidence shows that the *Ocean Concorde* was on the OCS for the purpose of drilling for oil and gas, our review of the summary judgment record leads us to conclude that because Diamond has failed to put forth evidence that the *Ocean Concorde* was "attached" to and "erected" on the seabed of the OCS, Diamond has not carried its initial burden of establishing that there is no genuine issue of material fact on the issue of whether the location of McMillon's alleged injury qualifies as an OCSLA situs.

Contrary to Diamond's contention, the summary judgment evidence does not show that McMillon's alleged injury occurred while the *Ocean Concorde* was physically "attached" to the ocean

---

granting its objections to the affidavits and failing to strike the affidavits from the record. Bradley stated in the affidavits that he was the Director of Claims for Diamond, that he had "personal knowledge of the facts stated" therein, and that he had access to and had reviewed Diamond's records as they pertain to information contained in the affidavits. We find that, based on Bradley's personal knowledge and his position with Diamond, it was not an abuse of discretion for the district court to consider the information contained in the affidavits.

In addition to Bradley's affidavits, Diamond also attempts to rely on McMillon's state court petition. McMillon's petition does not constitute proper summary judgment evidence. See, e.g., King v. Dogan, 31 F.3d 344, 346 (5th Cir. 1994) (holding that unverified pleadings do not constitute proper summary judgment evidence); Johnston v. City of Houston, 14 F.3d 1056, 1060 (5th Cir. 1994) (holding that unsworn pleadings do not constitute proper summary judgment evidence).

16

floor. After the *Ocean Concorde* was towed to its ultimate location, it would then be anchored to the seabed. The evidence does not indicate whether McMillon was welding inside a pollution pan during towing or while the *Ocean Concorde* was attached to the seabed by its anchors. Diamond asserts that because the alleged injury occurred when drilling mud was spilled on McMillon, and drilling mud is only used during the drilling process, the only reasonable inference is that the *Ocean Concorde* was engaged in drilling operations and thus attached to the ocean floor by its drilling mechanisms. Drilling mud is used "from the time a well is begun until the cessation of drilling at that hole."[14] Am. Petroleum Inst. v. E.P.A., 787 F.2d 965, 971 (5th Cir. 1986). There are a number of ways, however, that the drilling mud could have spilled into a pollution pan. It is possible that the drilling mud spilled when the *Ocean Concorde* was attached to the ocean floor during drilling operations, in which drilling mud is necessarily used. It is also possible, however, that the drilling mud spilled while preparing for drilling in the future or after drilling operations, when the *Ocean Concorde* was either attached to the ocean floor or in transit. See, e.g., LeBlanc v. Two-R Drilling Co., 527 F.2d 1316, 1318-19 (5th Cir. 1976) (explaining that when the drill pipe is removed from the hole and placed on the pipe rack, drilling mud is spilled from the drill pipe to the drilling floor); LaCross v. Craighead, AWI, 466 F. Supp. 880, 880-81 (E.D. La. 1979) (describing an incident where drilling mud spilled onto the deck of a vessel during loading operations when an employee lifted a torn sack over his head). Drawing all reasonable inferences in A&B's favor, as we must in reviewing

---

[14]Drilling mud is a heavy drilling fluid that is pumped down the drill pipe, through the drill bit used to drill the hole, into the hole, upwards between the drill pipe and the walls of the hole, and out into to a surface pit, where it is purified and begins the cycle again. Drilling mud has numerous functions, including maintaining hydrostatic pressure control in the hole, lubricating the drill bit, and removing drill cuttings from the hole. Am. Petroleum Inst., 787 F.2d at 971 (describing drilling mud); WILLIAMS & MEYERS, supra note 1, at 307, 650 (defining drilling fluids and mud).

17

the district court's grant of Diamond's motion for partial summary judgment, a genuine issue of material fact remains as to whether the *Ocean Concorde* was attached to the ocean floor. Since there is no evidence that the *Ocean Concorde* was connected to the ocean floor by its anchors or through its drilling mechanisms, and there is no evidence of any other contact with the seabed, the second requirement that the *Ocean Concorde* was "erected" on the OCS at the time of McMillon's alleged injury is clearly not satisfied. Thus, because we conclude that there is insufficient summary judgment evidence to determine whether the location of McMillon's alleged injury qualified under the second Demette situs test, partial summary judgment in favor of Diamond on the issue of whether A&B is obligated to indemnify and defend Diamond under the Master Service Contract was not supported by the record.

Diamond urges that, inasmuch as the Demette OCSLA situs test is controlling and the evidence in the summary judgment record is insufficient under Demette, we should remand this case to the district court with instructions to allow Diamond to supplement the summary judgment record. We agree.[15] In sum, Demette articulated a significantly different rule than had been used here by the district court in determining whether McMillon's alleged injury occurred on an OCLSA situs. Neither the district court nor the parties, in developing the summary judgment record and briefing the cross-

---

[15]A&B asserts that remand is not necessary because the absence of summary judgment evidence means that Diamond failed to raise a genuine issue of material fact as to whether the location of McMillon's alleged injury qualified as an OCSLA situs and, accordingly, the district court should have granted A&B's motion for partial summary judgment. Thus, A&B urges this Court to reverse the district court's denial of A&B's motion for partial summary judgment and render judgment in favor of A&B on Diamond's claims flowing from the indemnity provision. This argument misconstrues the summary judgment burden, which shifts to Diamond only if A&B meets the initial burden of establishing that there is no genuine issue of material fact. See Celotex Corp., 477 U.S. at 321-22. A&B has produced no evidence that the *Ocean Concorde* was not "attached" to and "erected" on the seabed of the OCS at the time of McMillon's alleged injury. Thus, partial summary judgment in favor of A&B was properly denied.

18

motions for partial summary judgment, had the benefit of our opinion in Demette. We therefore reverse the district court's grant of partial summary judgment on the issue of the validity of the indemnity provision and remand with directions to allow Diamond to put forth additional summary judgment proof and reconsider its ruling that this case arises out of an injury on an OCSLA situs. This should require only a brief supplement to the record detailing the contact, if any, that the *Ocean Concorde* had with the ocean floor at the time of McMillon's alleged injury, such as its anchors, drilling mechanisms, and flooded columns, displacement hulls, or caissons, that connected the rig to the seabed and supported the drilling platform. On remand, the district court should apply the rule enunciated in Demette to determine whether McMillon's alleged injury occurred on an OCLSA situs. As this Court has already concluded that the *Ocean Concorde* was a device on the OCS for the purpose of exploring for oil and gas, the district court will need to address whether, at the time of McMillon's alleged injury, the *Ocean Concorde* was "temporarily attached to the seabed of the OCS" and "erected on the seabed of the OCS" and therefore falls into the second category of OCSLA situses. Demette, 280 F.3d at 497. Although we reverse the district court's ruling on this issue and remand for application of the proper legal standard, we proceed to address A&B's further arguments in support of its contention that the district court erred in finding that the § 905(c) exception applied to this case.

A&B also avers that the district court erred in its status determination. The district court held that in order to qualify under OCSLA, an employee must also satisfy the "but for" test, i.e., the injury would not have occurred but for extractive mineral operations over the OCS. Diamond Offshore, 75 F. Supp. 2d at 683 (citing Herb's Welding, Inc. v. Gray, 766 F.2d 898, 900 (5th Cir. 1985 )). Moreover, the district court concluded that the "but for" test was satisfied because "the *Ocean*

19

*Concorde* was engaged in offshore mineral extracting activities; the *Ocean Concorde* needed a pollution plan in order to explore offshore oil; and McMillon would not have been injured but for the need to weld a pollution plan onto the *Ocean Concorde*." Id. We agree that McMillon's alleged injury occurred "as the result of operations conducted on the [OCS] for the purpose of exploring for, developing, removing, or transporting by pipeline the natural resources, or involving rights to the natural resources, of the subsoil and seabed of the [OCS]." 43 U.S.C. § 1333(b). McMillon was allegedly injured while performing necessary repairs on the OCS in furtherance of the *Ocean Concorde*'s extractive operations on the OCS. McMillon was doing welding work in a pollution pan on the *Ocean Concorde*, a semi-submersible drilling rig engaged to work for Shell, over 100 miles offshore in the Gulf of Mexico. The welding services that McMillon was performing at the time of his alleged injury were necessary to allow the *Ocean Concorde* to explore for offshore oil and perform its drilling function without polluting the waters of the Gulf of Mexico. Thus, this case meets the OCSLA status requirement set forth in § 1333(b).

A&B's second argument is that the district court erred in finding that the § 905(c) exception applied because the indemnity agreement between Diamond and A&B is not reciprocal and therefore is unenforceable under § 905(b). A&B reads the phrase "reciprocal indemnity provision" in § 905(c) to require true or complete reciprocity–i.e., equal obligations imposed on both parties.[16] Examination

_____

[16]To support this reading of § 905(c), A&B cites our decisions in Campbell v. Sonat Offshore Drilling Co., 979 F.2d 1115 (5th Cir. 1992), and Fontenot v. Mesa Petroleum Co., 791 F.2d 1207 (5th Cir. 1987). In Campbell, we recognized that the completely reciprocal indemnity provisions at issue satisfied the reciprocity requirement of § 905(c), but we did not establish "complete reciprocity" as the test. 979 F.2d at 1125. Likewise, in Fontenot, where the vessel owner and vessel charterer entered into a reciprocal indemnity agreement to indemnify each other "for injuries sustained by [their own] personnel, contractors, and property," we merely stated in a footnote that "[t]his type of mutual provision is precisely the type envisioned in and sanctioned by the 1984 amendments to the [LHWCA]." 791 F.2d at 1213 n.3. A&B also relies on the sparse legislative history behind the 1984

of the indemnity agreement between Diamond and A&B indicates that the agreement is sufficiently reciprocal to satisfy the § 905(c) exception.

A&B contends that its obligation to indemnify Diamond is more onerous than Diamond's corresponding obligation. The indemnity provision in paragraph 9 of the Master Service Contract obligates Diamond to defend and indemnify A&B against any claims brought by Diamond or its employees arising out of their work regardless of A&B's negligence, and obligates A&B to defend and indemnify Diamond and any parties for whom Diamond may be working against any claims brought by A&B or its employees arising out of their work regardless of Diamond's negligence.[17] A&B argues that this provision impermissibly enlarges A&B's burden by obligating A&B to defend and indemnify Diamond, as well as any companies for whom Diamond might be working. A&B

---

amendments to the LHWCA, which states that § 905(c) "removes the current proscription with respect to mutual indemnity agreements between employers and vessels as applied to the [OCS] by virtue of the [OCSLA]." Campbell, 979 F.2d at 1125 n.4 (quoting Pub. L. No. 98-426, reprinted in 1984 U.S.C.C.A.N. 2734, 27774-75). We note that congressional intent to validate mutual indemnity agreements lends no further support to A&B's assertion that the indemnity agreements must be truly reciprocal.

[17]Paragraph 9 reads in relevant part:
(a) [A&B] agrees to fully indemnify, release, defend . . . and hold harmless [Diamond] and all parties for whom [Diamond] may be working . . . against any and all claims, demands or actions for damages to persons and/or property (including, but not limited to, claims, demands or actions for bodily injury . . . ), which may be brought against [Diamond] by [A&B] or [its] employees . . . incident to, arising out of, in connection with, or resulting from, the activities of [A&B], its employees . . . , or in connection with the work to be done, services to be performed or material to be furnished under this Contract . . . whether occasioned, brought about, or caused in whole or in part by the negligence of [Diamond], [or] its . . . employees . . . ."
(b) [Diamond] agrees to fully indemnify, release, defend . . . and hold harmless [A&B] against any and all claims, demands or actions for damages to persons (including, but not limited to, claims, demands or actions for bodily injury . . . ), which may be brought against [A&B] by [Diamond] or [its] employees . . . incident to, arising out of, or in connection with the work to be done, services to be performed or material to be furnished under this Contract, whether occasioned, brought about, or caused in whole or in part by the negligence of [A&B], [or] its . . . employees . . . ."

21

protests that because McMillon sued several Shell entities that Diamond was working with, the indemnity provision may obligate A&B to defend and indemnify those entities in connection with the McMillon suit. Although A&B's indemnity obligation extends to parties for whom Diamond may be working, whereas Diamond's obligation only covers A&B, we do not find this distinction material to this appeal, which involves the reciprocity of the indemnity obligations running between Diamond and A&B. The district court found that A&B is obligated to indemnify Diamond under the Master Service Contract. The court did not address whether A&B is required to indemnify the various Shell entities sued in the McMillon suit. Thus, the fact that A&B agreed to defend and indemnify parties for whom Diamond was working has no effect on the fact that both Diamond and A&B agreed to defend and indemnify each other for claims brought on behalf of their own employees.

A&B also argues that the indemnity provisions are not reciprocal because A&B agreed to (1) defend and indemnify Diamond and any parties for whom Diamond may be working from "all liens and claims for labor or material" provided by A&B or its subcontractors; (2) indemnify Diamond for "any and all claims, demands and causes of action . . . made by any patentee, licensee, or claimant of any right or priority to" the equipment furnished and used by A&B; and (3) release Diamond from any liability for damages to A&B's surface equipment. These additional provisions concerning liens, intellectual property claims, and property damage are irrelevant to the issue before us, however, because the only indemnity provisions that are implicated by § 905(b) and § 905(c) are those covering claims brought by an LHWCA employee against a vessel for damages due to bodily injury or death of the employee caused by the negligence of the vessel. Under the indemnity provision governing claims for bodily injury, Diamond and A&B clearly agreed to indemnify each other. See Fontenot v. Southwestern Offshore Corp., 771 So. 2d 679, 687 (La. Ct. App. 2000) (rejecting employer's

22

argument that indemnity obligations were not "reciprocal" under § 905(c) because employer and vessel owner agreed to indemnify each other under the personal injury clause, even if their obligations differed concerning property damage, liens, and wreckage).

We likewise reject A&B's argument that the reciprocity of the indemnity provision is destroyed by A&B's insurance obligations in the Master Service Contract. An insurance procurement clause is valid under § 905(b). Sumrall v. Ensco Offshore Co., No. 01-30642, 2002 WL 956960, at *6 n.12 (5th Cir. May 9, 2002) ("We have determined that differing insurance obligations do not create additional indirect liability sufficient to implicate the prohibitions of subsection 905(b)."); Voisin v. O.D.E.C.O. Drilling Co., 744 F.2d 1174, 1176-78 (5th Cir. 1984) (holding that § 905(b) does not prohibit a valid additional insured provision). Thus, the fact that the insurance provision of the Master Service Contract required A&B to procure insurance, but that Diamond was not required to do the same, does not impact the reciprocity of the indemnity agreement. See Sumrall, 2002 WL 956960, at *6 n.12 ("[W]e find that any differences in insurance obligations owed between Premiere and Santa Fe does not undermine the reciprocity of their indemnification agreement."). The district court did not err, therefore, in finding that the indemnity provision is sufficiently reciprocal to meet the requirement of § 905(c).

## 2.

A&B also maintains that state law applies to the Master Service Contract as a "gap-filler under OCSLA" and that the reciprocal indemnity provision is invalid under either Louisiana or Texas anti-indemnity statutes. See LA. REV. STAT ANN. § 9:2780 (West 1991); TEX. CIV. PRAC. & REM. CODE ANN. § 127.001 et seq. (Vernon 1999). Presumably, A&B is relying upon § 1333(a)(2) of OCSLA to argue that either Louisiana or Texas law applies as a surrogate to federal law. Section

23

1333(a)(2) provides that "[t]o the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws . . . the civil and criminal laws of each adjacent State . . . are hereby declared to be the law of the United States [on OCS situses as defined by section 1333(a)(1)]." 43 U.S.C. § 1333(a)(2)(A). In order for state law to apply as a surrogate to federal law, the following three-part test announced in Union Texas Petroleum Corp. v. PLT Engineering ("PLT") must be satisfied: (1) the controversy must arise on an OCSLA situs, (2) federal maritime law must not apply of its own force, and (3) the state law must not be inconsistent with federal law. 895 F.2d 1043, 1047 (5th Cir. 1990). The district court rejected A&B's argument that state law applies as a surrogate to federal law to invalidate the indemnity provision, determining that the second prong of the PLT test was not satisfied because the Master Service Contract is a maritime contract. Diamond, 75 F. Supp. 2d at 679-81.

On appeal, A&B avers that the third prong of the PLT test is satisfied because federal law does not mandate that reciprocal indemnity agreements be valid. A&B makes no argument, however, that the first and second prongs are met in this case. Indeed, as discussed above, A&B argues strenuously on appeal that OCSLA is inapplicable because the situs requirement of § 1333(a)(1) is not satisfied. Even assuming that the first and third prongs are satisfied, because maritime law applies of its own force, neither Louisiana or Texas law applies in this case.

To determine whether the Master Service Contract is a maritime contract, we must consider the contract's "historical treatment in the jurisprudence" as well as a six-pronged "fact specific inquiry." Davis & Son, Inc. v. Gulf Oil Corp., 919 F.2d 313, 316 (5th Cir. 1990). Under the Master Service Contract entered into by Diamond and A&B, A&B provided vessel repair services to Diamond. Contracts for vessel repair services are traditionally treated as maritime. See New Bedford

24

Dry Dock Co. v. Purdy, 258 U.S. 96, 99-100 (1922); Southwest Marine v. United States, 896 F.2d 532, 533 (Fed. Cir. 1990). Thus, the historical treatment of contracts for vessel repair services supports a determination that the Master Service Contract is a maritime contract.

The six Davis factors also point to the conclusion that this is a maritime contract.[18] In this case, the work order provided that A&B would supply labor and materials to repair the *Ocean Concorde*; the crew was performing repair services onboard the *Ocean Concorde*; the crew was working on a vessel over navigable waters; the repairs to the *Ocean Concorde* were necessary so that the vessel could explore for oil and gas in the Gulf of Mexico; McMillon's principal work was as a welder; and McMillon was welding inside a pollution pan at the time of the alleged injury. We conclude that the Master Service Contract is a maritime contract, and therefore maritime law applies of its own force. Consequently, state law cannot apply as a surrogate of federal law. Since state law does not apply in this case, A&B's argument that state law anti-indemnity provisions govern the Master Service Contract fails.

B.

Finally, A&B challenges the district court's ruling that the insurance provision in paragraph 8 of the Master Service Contract is valid and enforceable. The insurance provision obligates A&B to obtain and maintain several types of insurance policies with stated minimum limits, waive claims for subrogation against Diamond, and name Diamond as an additional insured. A&B argues that the

---

[18]Under the factual inquiry, the court should consider: "1) what does the specific work order in effect at the time of the injury provide? 2) what work did the crew assigned under the work order actually do? 3) was the crew assigned to work aboard a vessel in navigable waters[?] 4) to what extent did the work being done relate to the mission of that vessel? 5) what was the principal work of the injured worker? and 6) what work was the injured worker actually doing at the time of injury." Davis, 919 F.2d at 316.

insurance provision creates a contingent obligation designed to assure performance of the reciprocal indemnity provision. The district court rejected this argument, determining that the insurance provision created an obligation independent of the reciprocal indemnity provision. We agree.[19]

A&B's argument focuses upon the following language:

> The insurance requirements set forth herein are *supplementary to* and shall not limit or restrict as to amount, extent or otherwise the indemnity obligations undertaken by [A&B] in Paragraph (9) herein. . . . . The Naming of [Diamond] as additional Insured and endorsement as respects of *primary insurance shall only apply as respects liability assumed by [A&B]* herein.

Paragraph 8 (emphasis added). A&B insists that the emphasized phrasing makes the validity of the insurance provision contingent upon the validity of the reciprocal indemnity provision. A&B maintains that because the reciprocal indemnity provision is invalid, the insurance provision cannot be enforced. A&B's argument improperly assumes the invalidity of the reciprocal indemnity provision. As previously explained, the validity of the reciprocal indemnity provision is dependent upon whether McMillon's alleged injury occurred on an OCSLA situs and must be addressed by the district court on remand. Even assuming the invalidity of the reciprocal indemnity provision,

---

[19]Alternatively, A&B argues that Diamond cannot establish that it suffered damages as a result of the alleged breach of the insurance provision. The district court held that "if A&B has failed [to procure the requisite insurance and name Diamond as an additional insured], that failure constitutes a breach of contract for which Diamond is entitled to recover damages." Diamond, 75 F. Supp. 2d at 685. Neither party moved for summary judgment on Diamond's breach of contract claim. Thus, the district court was presented with no evidence that A&B breached the insurance provision, and evidence regarding the extent of Diamond's damages caused by A&B's alleged breach of the insurance provision was not presented to the district court. The district court did not mention the issue of damages in its partial summary judgment ruling. Indeed, the district court dismissed Diamond's breach of contract claim before reaching this issue. Because A&B did not make this argument before the district court, we need not consider this issue raised for the first time on appeal. See Vogel v. Veneman, 276 F.3d 729, 733 (5th Cir. 2002).

26

however, we are not persuaded that the language A&B has identified was intended to create a contingent obligation.

The cases cited by A&B do not support the contractual interpretation that it advances.[20] Instead, our decision in LeBlanc v. Global Marine Drilling, 193 F.3d 873 (5th Cir. 1999), which was relied on by the district court, guides our resolution. In Leblanc, an employee of Franks Casing Crew & Rental Tools, Inc. ("Frank's") was injured while performing work for Shell on a drilling rig owned by Marine Drilling Management Company ("Marine"). Id. at 874. There was a contractual dispute as to whether Marine was an additional insured under its master service agreement with Frank's. Id. Among other arguments, Frank's maintained that the validity of the additional-insured provision was contingent upon an indemnity provision, which was barred by § 905(b) of the LHWCA. Id. at 875. Frank's relied upon the following contractual language: *"[T]o the extent Subcontractor [Frank's] assumes liability hereunder, and agrees to indemnify Contractor [Marine]*, Contractor shall be named an additional insured in [certain] insurance policies." Id. We rejected this argument, noting that "[i]f the parties had determined to condition Marine's assured status upon the legal enforceability of the indemnity agreement, they very easily could have done so." Id. Consequently, we held that Frank's was obligated to list Marine as an additional insured in its insurance polices and that this obligation arose automatically upon Frank's agreement to indemnify, regardless of the validity of the indemnity agreement. Id.

If Diamond and A&B had intended to condition A&B's insurance obligations upon the validity of the reciprocal indemnity provision, they easily could have done so. The Master Service

---

[20] A&B cites Seal Offshore, Inc. v. American Standard, Inc., 736 F.2d 1078 (5th Cir. 1984), and Getty Oil Co. v. Insurance Co. of North America, 845 S.W.2d 794 (Tex. 1992).

Contract could have explicitly required a *valid* indemnity agreement as a precondition to the insurance requirements. Instead, the Master Service Contract merely states that A&B's insurance obligations are "supplementary to . . . indemnity obligations *undertaken* by [A&B] . . . *herein*," and that A&B's agreement to name Diamond as an additional insured and endorse the procured insurance policies as primary insurance "shall only apply as respects liability *assumed* by [A&B] . . . *herein*." Consequently, we conclude A&B's insurance obligations arose when it agreed to indemnify Diamond in paragraph 9 and agreed to the terms of the Master Service Contract. Thus, the district court did not err in holding that the insurance provision in paragraph 8 of the Master Service Contract created an independent obligation that is valid and enforceable.

## CONCLUSION

For the reasons discussed above, we VACATE the district court's final judgment and REMAND to the district court for further consideration on the merits of Diamond's request for damages for breach of contract. Because we cannot determine from the summary judgment record whether McMillon's alleged injury occurred on an OCSLA situs, we REVERSE the district court's grant of partial summary judgment in favor of Diamond on the issue of whether the reciprocal indemnity provision of the Master Service Contract is valid, and REMAND with instructions. In all other respects, we AFFIRM the partial summary judgment rulings.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART, VACATED AND REMANDED IN PART.